# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2016

## STATE OF TENNESSEE v. CONNIE KHONSABANH VONGPHAKDY

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-72749    Royce Taylor, Judge**

---

**No. M2015-01296-CCA-R3-CD – Filed September 21, 2016**

---

The Appellant, Connie Kohnsabanh Vongphakdy, pled guilty in the Rutherford County Circuit Court to one count of theft $60,000 or more but less than $250,000; four counts of theft of $10,000 or more but less than $60,000; and two counts of theft of $1,000 or more but less than $10,000. Pursuant to the plea agreement, the Appellant received a total effective sentence of eight years. After a sentencing hearing, the trial court denied alternative sentencing and ordered the Appellant to pay restitution in the amount of $178,300. On appeal, the Appellant challenges the trial court's denial of alternative sentencing. The State concedes that the trial court did not consider the specific factors in Tennessee Code Annotated section 40-35-103 but contends that the trial court implicitly found that confinement was necessary to avoid depreciating the seriousness of the offense and to serve as a deterrent. Upon review, we reverse the judgments of the trial court and and remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Reversed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Thomas E. Parkerson (on appeal) and Shawn Williams (at trial), Murfreesboro, Tennessee, for the Appellant, Connie Kohnsabanh Vongphakdy.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jennings Hutson Jones, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

# I. Factual Background

In December 2014, a Rutherford County Grand Jury returned a multi-count indictment charging the Appellant with one count of theft $60,000 or more but less than $250,000, a Class B felony; four counts of theft of $10,000 or more but less than $60,000, Class C felonies; two counts of theft of $1,000 or more but less than $10,000, Class D felonies; two counts of forgery of $1,000 or more but less than $10,000, Class D felonies; and two counts of money laundering, Class B felonies. On March 25, 2015, the Appellant pled guilty to the theft offenses, and the forgery and money laundering counts were dismissed. Pursuant to the plea agreement, the Appellant was sentenced as a standard, Range I offender to eight years for the Class B felony, six years each for the Class C felonies, and four years each for the Class D felonies. The sentences were to be served concurrently for a total effective sentence of eight years. The plea agreement further provided that the trial court would determine the manner of service of the sentences and the amount of restitution, if any, to be imposed.

At the sentencing hearing, Jason Wilkerson, a special agent with the Tennessee Bureau of Investigation (TBI), testified that in June 2014, the District Attorney General's Office for the 16th Judicial District asked him to investigate the Appellant, who was a personal banker with Suntrust Bank. Agent Wilkerson explained that the federal Drug Enforcement Agency (DEA) had noticed the Appellant was depositing large sums of cash into an account at the Bank of America and that the cash was immediately withdrawn by individuals in Texas. The DEA initially thought the money was related to drug trafficking. When the DEA determined the transactions were not drug-related, they "stepped away from the issue." However, Suntrust Bank terminated the Appellant's employment.

Agent Wilkerson said that his investigation revealed that the Appellant took funds from the accounts of her personal banking clients, friends, and family members. Most of the victims were members of the Laotian community, as was the Appellant. Agent Wilkerson's investigation revealed that the Appellant filled out withdrawal slips for the accounts, obtained the cash at Suntrust Bank, and immediately either walked across the street to deposit the cash at a nearby Bank of America or used the Bank of America's "drive-thru." Agent Wilkerson asserted that the Appellant used her position as a personal banker to gain access to the funds.

Agent Wilkerson opined that the offenses began around May 2013 and continued until June 2014 when the transactions were discovered. The majority of the funds were taken from the Appellant's sister and brother-in-law, Amy and Edward Phimmasene, and their two children, Kayle and Christopher. Agent Wilkerson said the Appellant made over fifty withdrawals from the Phimmasenes' accounts totaling $131,500.

Agent Wilkerson said that the Appellant made four withdrawals totaling $30,000 from the account of Wath and Chinda Sisavath, who were friends of the family. The Appellant's aunt, Seng Thompson, submitted a claim for $24,000. Agent Wilkerson also questioned another ten transactions totaling $19,000. Chant Pranee Vongswady, whose daughter was the Appellant's friend, had $1,500 taken; the Appellant's sister, Nicole Sengaroun, had $20,000 taken from her accounts; and $3,000 was taken from the accounts of North and Sengu Sisavad.

The Appellant told Agent Wilkerson that she met a man named Jay Phan on the internet. Although she never met him in person, they had a romantic relationship, and she referred to him as her fiancé. Agent Wilkerson was never able to confirm whether Phan "actually existed," but he said that the Appellant believed Phan was real. The Appellant said that she had friends in Texas who acted as "go between[s]" for her and Phan. Phan often called the Appellant asking for help because he or his family were "in dire financial straits." Phan's pleas for financial help eventually led the Appellant to take money from the victims.

On cross-examination, Agent Wilkerson said that the Appellant had been cooperative since the beginning of the investigation. Agent Wilkerson said that officers in Texas discovered that the money was withdrawn from the account into which the Appellant deposited the money. The Appellant believed that the people who retrieved the money were Phan's relatives or friends. Agent Wilkerson said that during his investigation, he did not receive any information that led him to believe the recipients asked the Appellant to steal the money. He also did not receive any information that the Appellant took the money for her own use.

The Appellant testified that her family had lived "in the area" for almost thirty years. The Appellant worked for Suntrust Bank for ten years, and many of her clients came to her because they knew her family. She said that she helped members of the Laotian community because she "knew about banking and investments" and spoke their language. The Appellant asserted that she never had any "issues" until she met Phan and his friends.

The Appellant said that she met Phan on the internet several years earlier. She said that he was an airline mechanic, lived in Texas, and traveled for work from Canada to Germany. Phan always had excuses when she suggested they meet in person, but they "video chatted, emailed." They became friends then developed romantic feelings for each other. The Appellant said that she met one of Phan's friends, Ann Syda Kongsavath, in person many times. Additionally, Kongsavath's family came to visit the Appellant. They assured the Appellant that Phan was a "real person." The Appellant

said that she did not think Kongsavath would lie to her.  She said that she did not grow up "surrounded by people who scammed people or anything."

The Appellant said that at first, Phan asked for small things, such as birthday gifts for his family members.[1]  The Appellant sent the gifts directly to the family members, thinking it was "no big deal."  The Appellant said that Phan did not want to give her his address or banking information so she could send money directly to him.  She said that she found his evasion "fishy" but that she was "emotionally involved."  She agreed to put money into Kongsavath's account, and Kongsavath was supposed to give the money to Phan.  Initially, the Appellant gave money from her personal account.  She told Phan when her money was depleted.  Phan then told her that his mother had breast cancer and that he had financial problems.  He asked her to take money from her 401K retirement account and soon that account was also depleted.

The Appellant said that around the end of 2012 or the beginning of 2013, she had depleted all of her accounts and "had nowhere else to go."  At that point, she began taking money from the victims' accounts and had intended to replace it.  She stated that when she took money from her sister's account, she replaced as much as she could so they would not know what she was doing.  However, Phan and Kongsavath asked for more money, and the situation "escalated" and "got out of hand."  At that point, her employment with the bank was terminated.

The Appellant said that she was surprised when Agent Wilkerson told her that Phan did not exist.  She stated that she thought she was helping someone who needed her help.  The Appellant said that she tried to assist the authorities as much as she could.  She acknowledged that she made a mistake and that taking the money was wrong.  She maintained that she went to the Sisvaths and confessed that she had taken $30,000 from them and offered to pay back as much as she could.  She said that she wanted to reimburse the victims.  She acknowledged that she owed the victims a lot of money and that it would take time for her to pay them back.

She said that even though she was educated and had a bachelor's degree in psychology and a degree in business administration, she was "a stupid small town girl that got involved" in a "scam" and that "even education is not going to take you away from saying that you are not a victim."  She said that she lived with her parents and that she started a business selling items on eBay but made only enough money to buy gas. She said that she had various skills, such as photography and sewing, with which she could earn money.

_____

[1] The presentence report reflects that the Appellant was told that Phan's birthday was April 1.

On cross-examination, the Appellant acknowledged that she had failed to mention that she had violated the victims' trust. She further acknowledged that she stole from the victims multiple times and that it was not "one impulsive act." She stated that she stole from each victim in $1,000 and $2,000 increments. She forged the victims' names on withdrawal slips, took the slips to co-workers and received cash, walked across the street, and deposited the cash into Kongsavath's account at the Bank of America. She acknowledged that if she had electronically transferred the money to Phan or Kongsavath, the authorities could have tracked the money but by using cash, the authorities could not track the money. She acknowledged that she "thought through the best way to steal money from one account and successfully get it untraced into another account." Nevertheless, she asserted, "I didn't maliciously put a thought or anything into planning to take money like not having trace around it."

The Appellant conceded that the money she stole from her niece and nephew had been saved to pay for their college educations. The large amount of money she took from her sister was money her sister had from buying and selling a house. She admitted that she violated the trust of her family, her clients, Suntrust Bank, and the Laotian community. She said that she did not tell her family that Phan had financial difficulties because it was "shameful," and she did not want them to know she was "involved with someone like that."

The Appellant acknowledged that after one of the victims became suspicious, she replaced the missing funds with money from another person's account to conceal what she had done. She conceded that she had no way to repay the victims.

On redirect examination, the Appellant asserted that she had no prior criminal history. She acknowledged that her relationships with some of her family were permanently damaged.

Many Eng testified that the Appellant was her best friend and that they had known each other "since grade school," approximately thirty years. Eng said that the Appellant was caring, friendly, honest, and reliable. Eng, who lived in Atlanta, Georgia, said that she and the Appellant kept in touch but had been "kind of distant," noting that the Appellant did not tell her much about Phan. Eng warned the Appellant to be careful of anyone she met online. Nevertheless, Eng was happy the Appellant had found someone to love. Eng was surprised that the Appellant had been deceived by Phan because he "was also Laotian. And Lao people don't do that to each other."

Eng said that the Appellant had moved in with her parents, helped them with their English, and took them to doctor's appointments. She said that the Appellant had worked all her life.

Kaysone Phongsouvanh testified that she and the Appellant had been best friends since high school. She said that the Appellant had worked her way through college and "[a]lways had a job." The Appellant told Phongsouvanh said that she met Phan online but did not reveal that she had given him money. Phongsouvanh said that the Appellant was helpful but that it was out of character for her to steal.

The trial court noted that the Appellant came from a good family, had a good job, was hard working, well-educated, and had no "prior trouble." The court found that she had been cooperative with the authorities. The court stated that the foregoing factors indicated that the Appellant would be a good candidate for probation.

The trial court noted that the Appellant pled guilty to multiple counts involving multiple victims. The court stated that the Appellant

> was scammed and lost all of her funds. But then she abused a position of trust to begin stealing from friends and family members for a reason that she thought was appropriate. But, certainly, stealing to help someone else is never appropriate.
>
> And regardless of the reason, she's abused a significant position of trust. She had a position of trust with the bank as a personal loan officer. She had a position of trust with her family because she had an excellent reputation and was taking care of their finances as well. And she had a position of trust in her community because of her excellent reputation that her friends have testified about.
>
> So, abusing that position of trust, I think there is an over riding factor in this matter. And the fact that we have got multiple victims, an elaborate scheme that went on for a long period of time. And the only reason that it ended when it did was because of the Drug Enforcement Agency thinking that she was violating drug laws by sending these large sums of money that she was doing.

The court denied probation and ordered the Appellant to serve her eight-year sentence. The court further ordered the Appellant to pay restitution in the amount of $178,300, which was the amount listed in the presentence report.

On appeal, the Appellant challenges the trial court's denial of alternative sentencing.

## II.  Analysis

On appeal, the length, range, and manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness.  State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing).  In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of her sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less.  See Tenn. Code Ann. § 40-35-303(a).  The Appellant's sentences meet this requirement.  Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary.  See Tenn. Code Ann. § 40-35-102(6).  The Appellant's conviction of theft $60,000 or more but less than $250,000 is a Class B felony; therefore, she is not considered to be a favorable candidate

for alternative sentencing.

The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider the Appellant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5). Moreover, "the burden of establishing suitability for probation rests with the defendant" and the "burden includes demonstrating that probation will subserve the ends of justice and the best interest of both the public and the defendant." State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (internal quotation marks and citations omitted).

The Appellant contends that the trial court did not properly articulate its findings regarding sentencing and did not properly address the purposes and principles of sentencing. The Appellant further contends that the trial court erred by allowing one enhancement factor, namely the Appellant's breach of trust, to outweigh all other factors in favor of alternative sentencing. The State concedes that the trial court did not reference the factors in Tennessee Code Annotated section 40-35-103 specifically but contends that it nevertheless implicitly found that confinement was necessary to avoid depreciating the seriousness of the offense and to serve as a deterrent. We agree with the Appellant.

The trial court found that the Appellant was from a good family, had a good job, was hard-working and well-educated, had no prior criminal history, and had been cooperative with the authorities. The court noted that those factors indicated she would be a "good candidate for probation." Nevertheless, the court was concerned with the Appellant's breach of trust, noting that the offenses involved a large sum of money taken during "an elaborate scheme that went on for a long period of time" and that the offenses ended only because she was caught. The trial court did not specifically cite that it was

considering the purposes and principles of sentencing, and the record does not reflect that the trial court considered any of the factors listed in Tennessee Code Annotated section 40-35-103 in denying probation. Accordingly, we must remand to the trial court for reconsideration of the factors listed in 40-35-103.

### III.  Conclusion

We conclude that the judgments of the trial court must be reversed and the case remanded for resentencing.

_____
NORMA MCGEE OGLE, JUDGE